# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| THE WITTERN GROUP, INC.<br><br>Plaintiff,<br><br>v.<br><br>NOUFAL BABU PALLIPARAMBAN a/k/a NOUFAL BABU,<br><br>Defendant. | Case No.<br><br><br><br><br>**COMPLAINT** |

Plaintiff The Wittern Group, for its Complaint against Noufal Babu Palliparamban a/k/a Noufal Babu, states as follows:

## NATURE OF THE ACTION

1. This is an action for trade secret misappropriation in violation of the federal Defend Trade Secrets Act and Iowa Uniform Trade Secrets Act, breach of contract, and breach of fiduciary duties.

## PARTIES

2. Plaintiff The Wittern Group, Inc. ("Plaintiff" or "TWG") is an Iowa corporation with a principal place of business at 8040 University Boulevard, Clive, Iowa 50325.

3. Defendant Noufal Babu Palliparamban ("Defendant") is an individual residing in West Des Moines, Iowa.

4. Upon information and belief, Defendant is a citizen of India.

5. Upon information and belief, Defendant is also known by various aliases such as "Noufal Babu."

6. Defendant was employed by Plaintiff as a software engineer until his resignation effective December 8, 2023.

## JURISDICTION AND VENUE

7. Subject matter jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1331 because this action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and because the relevant trade secrets are related to products or services used in, or intended for use in, interstate or foreign commerce. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over TWG's state claims.

8. The Court has personal jurisdiction over Defendant because he is residing in Iowa, working at all relevant times under an H-1B work visa. The Court also has personal jurisdiction over Defendant because he committed acts within Iowa and this judicial district that gave rise to this action.

9. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## RELEVANT FACTS

### TWG's Background

10. TWG specializes in the design, manufacturing, sale and leasing of automated dispensing technology, most commonly associated with vending machines.

11. TWG's market expands beyond traditional soda and snack vending machines, however, and its technology is used in a variety of other industries. For example, TWG's smart vending technology allows healthcare organizations to secure narcotics and controlled substances, restrict access by user credentials or product classification, track inventory in real-time, and maintain full accountability and compliance with applicable government regulations. TWG's

innovative technology solutions are also used in the workplace to provide secure, self-service access to personal protective equipment, office supplies and technology devices and accessories.

12. Today, many of TWG's innovative dispensing solutions make use of the company's iQ Technology, a cloud-based inventory management system that enables organizations across various industries to reduce inventory costs and increase productivity. Powered by proprietary hardware and software, iQ Technology provides real-time analytics and allows administrators to set restrictions, track inventory usage, generate reports, and receive alerts.

### Defendants' Employment at TWG

13. TWG hired Defendant on or around August 17, 2015, as a software engineer.

14. As part of his employment with TWG, Defendant executed an Employment Agreement on or around August 17, 2015. A true and accurate copy of Defendant's Employment Agreement is attached as Exhibit A.

15. Defendant agreed that during the term of his employment he would "devote his *entire* time, attention, and energies to the business of" TWG and he would not "be engaged in any other business activity." Exhibit A, ¶ 5 (emphasis added).

16. Defendant acknowledged that as part of his employment he would have access to TWG's "customer lists, business forms, product designs, manufacturing processes, sales methods, financial information, corporate organization and other trade secrets and business information" that are of special value to TWG. Defendant agreed he would "not at any time during or after the term of his/her employment disclose any of such information or any part thereof." Exhibit A, ¶ 6.

*Defendant's Citizenship*

17. Upon information and belief, Defendant is a citizen of India and is still a lawful resident of the United States.

18. Defendant obtained status as a lawful resident by obtaining an H-1B work visa in order to enable his employment with TWG.

19. Upon information and belief, following the loss of employment with TWG, Defendant's H-1B status is uncertain, and it is unknown whether he will be allowed to continue to reside in the United States or must return to India.

*Defendant's Work at TWG*

20. As a software engineer at TWG, Defendant worked on projects for TWG's subsidiary, Fawn Engineering Corp. ("Fawn"). Beginning late 2018, and for the remainder of his employment, Defendant devoted significant time developing dispensing solutions that have been commercialized as iQ Technology, cutting-edge technology for smart vending solutions. For example, Defendant wrote software code embedded on control boards in dispensing machines and managed other aspects of software development critical to the functionality of iQ Technology. Defendant was a project lead for several of these initiatives during the term of his employment.

21. As part of Defendant's work with TWG and Fawn, Defendant had access to a broad range of TWG's and Fawn's confidential, proprietary, and trade secret information ("TWG Confidential Information"), including, but not limited to, the following:

    a. Business requirements and specifications for iQ Technology;

    b. Schematics of control boards used in smart dispensers and lockers;

    c. Software code (or firmware) embedded on the control boards;

    d. Functional test documentation that includes design features of iQ Technology;

  e. Documentation explaining the functionality of control boards used in smart dispensers and lockers;

  f. Technical designs of vendor sensors;

  g. Application Programming Interfaces ("API's") on control boards used to communicate with back-end software systems; and

  h. Software to enable the web-based functionality and features of iQ Technology.

22. The TWG Confidential Information is accessible to a limited number of TWG employees on a need-to-know basis. TWG takes steps to ensure the confidentiality of the TWG Confidential Information in several ways including, but not limited to, the following:

  a. Entering into confidentiality and non-disclosure agreements with outside vendors;

  b. Maintaining password protected access to the company's computer networks;

  c. Providing only qualified individuals with credentials to access the company's computer networks;

  d. Utilizing cyber-security solutions to protect against cyber-security attacks; and

  e. Maintaining secure software repositories to protect software code during the development process and upon completion.

23. The steps outlined in the preceding paragraph were and are followed with respect to the TWG Confidential Information at issue in this matter.

24. TWG developed the TWG Confidential Information using significant resources and time, for its own benefit.

25. TWG maintains and polices its policies with respect to the use and dissemination of the TWG Confidential Information.

*Defendant Convinces TWG to Contract with Lanware Solutions*

26. Defendant, during his employment, encouraged TWG and Fawn to contract with a third-party vendor, Lanware Solutions, LLP ("Lanware") for Lanware to provide software services to TWG and Fawn for use in their smart dispensing systems, which were commercialized as iQ Technology.

27. Lanware is a company organized and headquartered in Kerala, India.

28. Fawn first contracted with Lanware in or around August 2018, solely at Defendant's suggestion.

29. After contracting with Lanware, Defendant served as a technical guide and liaison between Lanware and TWG.

30. Lanware helped develop the software code to enable the web interface, feature sets, and functionality of the iQ Technology. However, unlike Defendant, Lanware did not have access to the schematics and other details of the control boards, which is highly-confidential, trade secret information.

31. In late 2022, TWG discovered that Defendant's spouse, Baby Farsana Noufal, filed the organizational documents for Lanware Solutions LLC, an Iowa limited liability company under the same name as the Indian company with which Fawn had contracted. Defendant never disclosed this connection to TWG.

*Defendant Resigns and Copies TWG Confidential Information*

32. On or around November 1, 2023, TWG requested Defendant sign an updated employment contract and new employee handbook. TWG made repeated requests over the next month that Defendant review and sign the documents.

33.     On December 7, 2023, Defendant requested to meet with representatives from TWG that same day at approximately 2:30 p.m., but they did not meet until the next day. On December 8, 2023, Defendant met with his supervisor and a human resources representative. Defendant refused to sign either of his employment contract or the employee handbook. Defendant also denied that he had previously signed his current employment contract or employee handbook. Only after being shown copies of these documents with his signature affixed did Defendant concede that he had signed them. As a result of his refusal to sign the updated documents, Defendant was deemed to have voluntarily resigned his employment effective immediately on December 8.

34.     Defendant's last day of employment at TWG was December 8, 2023. TWG's information technology department was notified was Defendant's termination and turned off Defendant's access to TWG's network and email accounts that same day.

35.     At that time of Defendant's termination, TWG provided Defendant with a copy of his 2015 employment agreement and reminded Defendant of his obligation not to disclose TWG's confidential information. TWG also instructed Defendant to return his company laptops on his last date of employment.

36.     But Defendant did not return TWG computers, control boards, and company tablets still in his possession until several days after his last date of employment at TWG.

37.     After Defendant's departure, TWG conducted a review of Defendant's company e-mail account.

38.     TWG found in Defendant's deleted e-mails folder that the COO of Lanware had sent an e-mail to Defendant on November 15, 2023, with an attachment including what appeared to be to provide software development services to one of TWG's direct competitors.

39. The commercial proposal indicates Lanware was proposing to create a smart vending solution for TWG's competitor that was at least similar to, if not the same as, portions of the iQ Technology. Several of the same persons associated with Lanware and named on the proposal were involved in Lanware's software development work for iQ Technology.

40. After discovering this deleted email, TWG engaged a third-party vendor to conduct a forensic data and use analysis of Defendant's company laptop.

41. The forensic analysis revealed that on or around December 7, 2023, immediately before Defendant resigned, and again on December 12, 2023, mere days after termination of Defendant's employment with TWG and prior to the date he returned TWG's laptop computers, Defendant accessed a number of TWG computer files on the laptops that contained TWG Confidential Information, many of which were unrelated to any of the work Defendant did while employed with TWG.

42. The forensic analysis showed that at the same time Defendant accessed these unauthorized files, USB drives were installed on Defendant's computer and that similar files and directories were created on the USB drives.

43. The forensic analysis indicates it is highly likely that Defendant has copied and misappropriated files containing TWG Confidential Information to the USB drives to retain the information for his personal or other use. This includes, but is not limited to, the following:

   a. Schematics of control boards used in smart dispensing machines with iQ Technology, including a new generation control board;

   b. Functional test documentation with design features and requirements for vending sensors; and

  c. Development configuration instructions and computer files that can be used to replicate the new generation control boards for iQ Technology.

44. While still employed by TWG, Defendant removed TWG Confidential Information from TWG, including information stored electronically on TWG's computers, computer network, and/or information technology systems.

45. On information and belief, Defendant has a unique relationship with Lanware and a similar-named company formed by his spouse.

46. Defendant has misappropriated TWG Confidential Information for himself and, upon information and belief, for the benefit of others, and to the detriment of TWG.

47. Defendant had no legitimate business reason to take this TWG Confidential Information or engage in these activities on TWG's computer systems and network, especially in the days leading to and after his resignation.

48. The TWG Confidential Information misappropriated by Defendant was developed by TWG through significant effort and substantial cost for use in its business by its employees for the exclusive benefit of TWG.

49. Defendant has misappropriated TWG Confidential Information in violation of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and the Iowa Uniform Trade Secrets Act, Iowa Code ch. 550.

50. Defendant's actions set forth above also amount to a violation of his Employment Agreement, TWG's policies, and his fiduciary duties as provided by law. If Defendant is permitted to use and disclose TWG Confidential Information to third parties, including Lanware and TWG's competitors, TWG will suffer competitive harm and damage that is extremely difficult, if not impossible, to calculate, but could easily be in the millions of dollars annually.

51. To prevent TWG from suffering irreparable harm, injunctive relief is necessary in the form of an order for Defendant, and others in active concert and participation with Defendant, to return immediately all of the TWG Confidential Information that he has misappropriated and is in his possession, including all flash drives containing any the TWG Confidential Information and any computer devices that have been connected thereto.

## COUNT I
### Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

52. TWG incorporates all of the above paragraphs as though fully set forth herein.

53. TWG owns and possesses certain confidential, proprietary, and trade secret information, as alleged above. This TWG Confidential Information includes, but is not limited to, the items detailed in the aforementioned paragraphs. None of this TWG Confidential Information is disclosed publicly or disseminated to anyone without a need to know and/or is not bound by an appropriate confidentiality agreement.

54. TWG's confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

55. TWG has taken reasonable measures to keep such information secret and confidential.

56. TWG has at all times maintained stringent security measures to preserve the secrecy of its trade secrets.

57. Due to these security measures, TWG's confidential and proprietary trade secret information is not available for others in the control dispensing industry—or any other industry—to use through any legitimate means.

58. TWG's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value and competitive advantage from the disclosure or use of the information.

59. In violation of TWG's rights, Defendant misappropriated TWG's confidential, proprietary, and trade secret information in the improper and unlawful manner as alleged herein. Defendant's misappropriation of TWG's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Defendant has attempted and continues to attempt to conceal his misappropriation.

60. On information and belief, if Defendant is not enjoined, Defendant will continue to misappropriate the use of TWG's Confidential Information for his own benefit and to TWG's detriment.

61. As the direct and proximate result of Defendant's conduct, TWG has suffered and will continue to suffer severe competitive harm, irreparable injury, and significant damages in an amount to be proven at trial. Because TWG's remedy at law is inadequate, TWG seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. TWG's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

62. TWG has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorney's fees.

## COUNT II
### Violation of Iowa Uniform Trade Secrets Act, Iowa Code Ch. 550

63. TWG incorporates all of the above paragraphs as though fully set forth herein.

64. The TWG Confidential Information at issue constitutes trade secrets as defined by Iowa's Uniform Trade Secrets Act. TWG owns and possesses certain confidential, proprietary, and trade secret information, as alleged above. This TWG Confidential Information includes, but is not limited to the items detailed in the aforementioned paragraphs. None of these trade secrets are disclosed publicly or disseminated to anyone without a need to know, and the information has actual or potential independent economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

65. TWG has undertaken efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets at issue.

66. Defendant knew or should have known under the circumstances that the information he misappropriated were trade secrets.

67. Defendant misappropriated and threaten to further misappropriate trade secrets at least by acquiring trade secrets with knowledge of or reason to know that the trade secrets were acquired by improper means, and Defendant is using and threatening to use the trade secrets acquired by improper means without TWG's knowledge or consent.

68. As a direct and proximate result of Defendant's conduct, TWG is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and that will be proven at trial. TWG has also incurred, and will continue to incur, additional damages, costs and expenses, including attorney's fees, as a result of Defendants' misappropriation. As a further proximate result of the misappropriation and use of TWG's trade secrets, Defendant was unjustly enriched.

69. The aforementioned acts of Defendant were willful and malicious. TWG is therefore entitled to exemplary damages under Iowa Code section 550.4(2).

70. Defendant's conduct constitutes transgressions of a continuing nature for which TWG has no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, Defendant will continue to retain and use TWG's trade secret information to enrich himself and divert business from TWG. TWG is entitled to an injunction against the misappropriation and continued threatened misappropriation of trade secrets as alleged herein and further asks the Court to restrain Defendant, and those in active concert and participation with Defendant, from using all trade secret information misappropriated from TWG and to return all trade secret information to TWG.

71. Pursuant to Iowa Code Section 550.6 and related law, TWG is entitled to an award of attorneys' fees for Defendants' willful and malicious misappropriation of trade secrets.

## COUNT III
## Breach of Contract

72. TWG incorporates all of the above paragraphs as though fully set forth herein.

73. TWG and Defendant entered into the Employment Agreement described above, which constitutes a valid contract under Iowa law. *See* Exhibit A.

74. TWG has fully performed its obligations under the Employment Agreement.

75. Defendant breached the Employment Agreement by wrongfully misappropriating and disclosing the TWG Confidential Information to third parties, for his and other's benefit and to TWG's detriment.

76. As a direct and proximate result of Defendant's conduct, TWG is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and that will be proven at trial. As a further proximate result of the misappropriation and use of TWG's trade secrets, Defendant was unjustly enriched.

## COUNT IV
## Breach of Fiduciary Duties

77. TWG incorporates all of the above paragraphs as though fully set forth herein.

78. As a software engineer, Defendant was a key employee and owed certain duties to TWG, including but not limited to, the fiduciary duties of undivided loyalty, trust, confidence, full disclosure, and utmost good faith for all matters connected to his employment with TWG.

79. Defendant's continued employment with TWG was conditioned upon agreeing to abide by the terms and conditions set forth in the above Employment Agreement, including the confidentiality obligations.

80. TWG relied on Defendant's loyalty and integrity and his faithful performance of his duties and responsibilities.

81. Defendant breached his duties to TWG by, among other things, misappropriating TWG Confidential Information.

82. Defendant's wrongful conduct has caused immediate and ongoing irreparable harm to TWG.

83. In committing the foregoing acts, Defendant acted willfully, wantonly, maliciously, and with utter indifference to TWG's rights.

84. As a direct and proximate result of Defendant's conduct, TWG is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and that will be proven at trial.

## **PRAYER FOR RELIEF**

TWG respectfully requests that judgment be entered as follows:

1. Judgment against Defendant for his violations of the federal Defend Trade Secrets Act and Iowa Trade Secrets Act, and an award of actual/compensatory damages, exemplary,

punitive damages, and damages in an amount equal to the amount that Defendant was unjustly enriched as a result of his misappropriation, along with TWG's full costs of forensic review and examination and TWG's attorneys' fees in an amount to be proven at trial;

2. Judgment against Defendant for his breaches of his fiduciary duties and breaches of contract, and an award of damages to TWG in an amount to be proven at trial, including but not limited to, any compensation paid to Defendant for services while he was engaged in activities that breached his fiduciary duties to TWG;

3. Entry of a temporary restraining order, a preliminary injunction, and permanent injunction against Defendant, and those in active concert and participation with Defendant, because (1) TWG is likely to succeed on the merits; (2) there is the threat of irreparable harm or injury to TWG absent an injunction; (3) the balance between the harm to TWG in the absence of injunctive relief and the harm that the injunction's issuance would inflict upon Defendant favors TWG; and, (4) the public interest favors TWG;

4. Costs, attorneys' fees, pre-judgment and post-judgment interest; and

5. Any other relief the Court may deem just, equitable, and proper.

Dated:  April 29, 2024					Respectfully submitted,

*/s/ Jeffrey D. Harty*
Jeffrey D. Harty
Lynn C. Herndon
Dana W. Hempy
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309
T: (515) 283-3100
F: (515) 283-3108
E: jharty@nyemaster.com
E: lherndon@nyemaster.com
E: dhempy@nyemaster.com

**ATTORNEYS FOR PLAINTIFF THE WITTERN GROUP**